UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

REBECCA RODRIGUEZ,

                                    Plaintiff,

              v.

CAROLYN W. COLVIN, *Acting Commissioner of*
*Social Security*,

                                    Defendant.

------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: April 18, 2016

15 Civ. 297 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

      Plaintiff Rebecca Rodriguez ("Rodriguez" or "Plaintiff") filed this action

pursuant to Section 205(g) of the Social Security Act ("the Act"), 42 U.S.C.

§ 405(g), seeking review of a decision by the Commissioner of Social Security

(the "Commissioner" or "Defendant") denying Rodriguez's application for

Supplemental Security Income based on a finding that Rodriguez did not meet

the Act's criteria for disability.  The parties have filed cross-motions for

judgment on the pleadings.  Because the Administrative Law Judge failed to

develop the record adequately by seeking a medical source statement from

Plaintiff's treating physician, Plaintiff's motion is granted to the extent it seeks

remand and rehearing, and the Commissioner's motion is denied.

# BACKGROUND[1]

Plaintiff filed a protective application for Supplemental Security Income on January 19, 2011, alleging disability as of February 12, 2010. (SSA Rec. 251).[2] The Commissioner denied this initial claim on March 29, 2011. (*Id.* at 83-86). Plaintiff subsequently requested and received a hearing before an Administrative Law Judge (the "ALJ") on March 12, 2012, pursuant to 20 C.F.R. § 404.929; this was adjourned to July 26, 2012, and then to February 11, 2013, in order for Plaintiff to seek counsel. (*Id.* at 30-36, 37-41). On February 11, 2013, Plaintiff's counsel appeared before the ALJ but indicated that Plaintiff could not attend due to treatment following an asthma attack. (*Id.* at 42-46). On April 19, 2013, Plaintiff appeared with counsel and testified at her benefits hearing, and on May 9, 2013, the ALJ issued his decision denying benefits. (*Id.* at 14-24, 47-81).

## A.    Plaintiff's Physical and Social Background

Plaintiff, born on November 17, 1980, claims disability as of January 19, 2011, the date on which she filed her application for supplemental security income. (SSA Rec. 251). Plaintiff bases her claim on a number of physical conditions, including emphysema, pneumonia, and chronic asthma. (*Id.* at

---

[1]    The facts contained in this Opinion are drawn from the Social Security Administrative Record ("SSA Rec.") (Dkt. #15) filed by the Commissioner. For convenience, Plaintiff's supporting memorandum (Dkt. #11) is referred to as "Pl. Br."; Defendant's supporting memorandum (Dkt. #16) as "Def. Br."; and Defendant's memorandum in opposition (Dkt. #20) as "Def. Opp."

[2]    Although Plaintiff's alleged onset date in her disability report is February 12, 2010, the parties each state that she ultimately claimed January 19, 2011, her filing date, as her alleged onset date. (Pl. Br. 1; Def. Br. 2).

256).  Plaintiff was last employed in 2006 as a home attendant, but she ceased

working after developing pneumonia while pregnant, which resulted in

extensive breathing problems.  (*Id.* at 52-53).  As a result, Plaintiff has been out

of work since that time.  (*Id.* at 53).

**B.    Plaintiff's Physical Evaluations and Treatment**

Plaintiff's medical records indicate that she was hospitalized

approximately five times between May 2009 and September 2010.  (SSA

Rec. 316-17, 479-80, 488, 494).  Several medical records state that Plaintiff

was admitted to Montefiore Hospital with complaints of difficulty breathing,

and she was intubated on at least two occasions.  (*Id.* at 317, 326).

Nonetheless, because Plaintiff's claimed onset date is January 19, 2011, the

Court, like the ALJ, will consider the medical evidence and opinions following

that date.  (*Id.* at 16).  Given Plaintiff's extensive medical treatment between

January 2011 and May 2013, the Court will address Plaintiff's medical visits

with treating physicians in chronological order, followed by Plaintiff's

consultative examination.

**1.    Plaintiff's Treating Physicians**

On June 6, 2011, Plaintiff visited Dr. John Culmine, who noted that

Plaintiff had bilateral wheezing and had been using her Albuterol pump for her

asthma frequently.  (SSA Rec. 654-55).  Plaintiff's oxygen saturation was 95%

at that time.  (*Id.* at 655).[3]  Dr. Culmine stated that Plaintiff was taking Advair, and he prescribed a five-day course of Prednisone.  (*Id.* at 656).

One month later, on July 6, 2011, Plaintiff had a follow-up visit with Dr. Culmine.  (SSA Rec. 499).  Dr. Culmine stated that Plaintiff had chronic shortness of breath but no wheezing.  (*Id.*).  He also noted that Plaintiff "[w]as supposed to be on prednisone 20mg daily following intubation," but had "[s]topped this a few weeks ago" as she "ran out of meds."  (*Id.*).  Plaintiff's lungs were "clear to auscultation," with "no crackles, rhonchi, or wheezing" at that time.  (*Id.* at 502).[4]  Dr. Culmine stated that Plaintiff "chronically [had] a low O2 sat[uration]," and he restarted Plaintiff on Prednisone and referred her to a pulmonologist.  (*Id.*).

Over six months later, on January 25, 2012, Plaintiff visited Dr. Culmine with complaints of worsening asthma and wheezing over the course of one week.  (SSA Rec. 504).  Dr. Culmine stated that Plaintiff was "chronically taking prednisone 10mg."  (*Id.*).  He recorded Plaintiff's oxygen saturation at 91%, and said her lungs demonstrated diffuse bilateral wheezing.  (*Id.* at 505).  Dr. Culmine again prescribed a five-day course of Prednisone, along with Albuterol, Ventolin, Spiriva, Claritin, Advair, and Singulair.  (*Id.* at 506).

---

[3]     Normal blood oxygen levels range from 95-100%.  *Hypoxemia*, Mayo Clinic, http://www.mayoclinic.org/symptoms/hypoxemia/basics/definition/sym-20050930 (last visited on Apr. 15, 2016).

[4]     Auscultation refers to the process of listening to a patient's lungs during physical examination; rhonchi refers to an abnormal sound from the lungs during breathing. *Breath sounds*, MedlinePlus, https://www.nlm.nih.gov/medlineplus/ency/article/007535.htm (last visited on Apr. 14, 2016) (hereinafter, "*Breath sounds*").

Then, on February 13, 2012, Plaintiff visited Dr. Culmine for an "annual physical" with complaints of "dyspnea at rest and dyspnea with exercise." (SSA Rec. 476).[5]  Plaintiff reported feeling better since her previous visit, but noted aching pain in her elbows and knee.  (*Id.* at 476-77).  Dr. Culmine again stated that Plaintiff's lungs revealed diffuse wheezes, and her oxygen saturation was 95%.  (*Id.* at 477).  He prescribed Albuterol, Ventolin, Claritin, Advair, Singulair, Spiriva, and Prednisone, in addition to calcium and vitamin D.  (*Id.* at 478).

On February 28, 2012, Plaintiff visited Dr. Max O'Donnell, who "measured multiple oxygen saturations which ranged from 97-94%" and found that Plaintiff "did not desaturate with her right side down."  (SSA Rec. 458). Plaintiff's lungs were "clear bilaterally to auscultation and percussion" at that time.  (*Id.* at 461).  Dr. O'Donnell's examination record also stated that Plaintiff "describe[d] worse asthma symptoms with upper respiratory tract infections, cold air, hot air, [and] dust," and that Plaintiff had "1 block exercise tolerance, 1 flight of stairs dyspnea that does not depend on her asthma status, [i.e.,] occurs whether she is wheezing or not."  (*Id.* at 458, 462).

Next, on April 6, 2012, Plaintiff's pulmonary function was evaluated by Dr. Jay Dobkin, who indicated that she showed "significant improvement after inhaled bronchodilators."  (SSA Rec. 465).  Prior to administration of bronchodilators, Dr. Dobkin measured Plaintiff's forced vital capacity ("FVC") at

---

[5]     Dyspnea is an alternative term for shortness of breath.  *Breathing difficulty*, MedlinePlus, https://www.nlm.nih.gov/medlineplus/ency/article/003075.htm (last visited on Apr. 14, 2016).

2.37 liters, and her one-second forced expiratory volume ("FEV1") at 1.49 liters. (*Id.* at 467).[6]  After administration of bronchodilators, Dr. Dobkin measured Plaintiff's FVC at 2.87 liters, and her one-second FEV1 at 1.96 liters.  (*Id.*). Overall, Dr. Dobkin diagnosed "[m]oderate obstructive disease with air trapping with an excellent response to inhaled bronchodilators.  The diagnosis of obstructive disease is further supported by the increase in the airway resistance and a decrease in the airway conductance."  (*Id.*).

On June 1, 2012, Plaintiff again visited Dr. Culmine, who asked her questions to determine her asthma severity.  (SSA Rec. 469).  Dr. Culmine recorded that Plaintiff had asthma symptoms three to six days per week, and her "asthma symptoms currently limit[ed] physical activity."  (*Id.*).  Further, as Dr. Culmine noted, Plaintiff's "compliance with asthma medications [was] described as excellent," and she was "[s]eeing pulmonary" doctors and needed medication refills.  (*Id.*).  Dr. Culmine noted that Plaintiff denied dyspnea at that time, "both at rest and with exercise."  (*Id.* at 471).  Her oxygen saturation was 96%, and her lungs were "clear to auscultation; no crackles, rhonchi, or wheezing."  (*Id.* at 471, 473).

Then, on August 18, 2012, Plaintiff was admitted to Montefiore Hospital for "evaluation of [her] asthma issues."  (SSA Rec. 529).  The triage nurse noted that Plaintiff exhibited "moderate inspiratory and expiratory wheezing," but "no

---

[6]     Forced vital capacity and forced expiratory volume are different measurements for pulmonary function.  *Pulmonary function tests*, MedlinePlus, https://www.nlm.nih.gov/medlineplus/ency/article/003853.htm (last visited Apr. 14, 2016).

rales [and] no rhonchi." (*Id.* at 533).[7]  The hospital record states that Plaintiff reported being unable to use her nebulizer at home because it was not working.  (*Id.*).  Plaintiff was diagnosed with severe allergic asthma and hypoxemia.  (*Id.*).[8]  Exam results indicated that Plaintiff's lungs showed "no focal pulmonary consolidation"[9] and "no pleural effusions."[10]  (*Id.* at 540).

Testing performed on August 20, 2012, further revealed that Plaintiff had a "[s]evere obstructive ventilator defect" with "no acute response to [an] inhaled bronchodilator." (*Id.* at 554).  The results showed Plaintiff had "concavity of the expiratory flow volume loop," consistent with asthma or chronic obstructive pulmonary disease ("COPD").  (*Id.*).  Plaintiff reportedly improved with intravenous ("IV") steroids and further treatment, and she was discharged as stable on August 24, 2012.  (*Id.* at 529).

Approximately four months later, on December 11, 2012, Plaintiff visited otorhinolaryngologist ("ENT") Dr. Andrew Tassler.  (SSA Rec. 703).  Dr. Tassler

---

[7]     Rales are small clicking, bubbling, or rattling sounds in the lungs.  *Breath sounds, supra.*

[8]     Hypoxemia refers to "below-normal level of oxygen" in blood and is a sign of issues related to breathing or circulation.  *Hypoxemia (low blood oxygen)*, Mayo Clinic, http://www.mayoclinic.org/symptoms/hypoxemia/basics/definition/sym-20050930 (last visited Apr. 14, 2016).

[9]     Pulmonary consolidation refers to opacification observed on a computerized tomography ("CT") scan of the chest.  *Consolidation (basic)*, Radiopaedia.org, http://radiopaedia.org/articles/consolidation-basic (last visited Apr. 14, 2016).

[10]    Pleural effusion is a "buildup of fluid between the layers of tissue that line the lungs and chest cavity."  *Pleural effusion*, MedlinePlus, https://www.nlm.nih.gov/medlineplus/ency/article/000086.htm (last visited Apr. 14, 2016).

diagnosed Plaintiff with shortness of breath and possible sialadenitis,[11] but "no signs of tonsillitis or tonsiliths." (*Id.*). Dr. Tassler's report also stated "[p]aradoxical vocal fold motion noted." (*Id.*).[12] He instructed Plaintiff to visit a laryngologist. (*Id.*).

On December 17, 2012, Dr. Tassler performed a CT scan of Plaintiff's neck, which also indicated possible sialadenitis, along with "mild prominence of level Ib lymph nodes[,] left greater than right[,] which do not meet CT size criteria." (SSA Rec. 696). Further, the scan indicated "minimal paraseptal emphysema along the lateral left upper lung." (*Id.* at 696-97).

The following month, on January 7, 2013, Plaintiff again visited Dr. Culmine, who noted that Plaintiff was "off steroids" but "using albuterol 2-3 times per day." (SSA Rec. 663). Dr. Culmine referenced a "recent hospitalization for asthma after [Plaintiff] was cleaning up after cat," and stated that Plaintiff had a severe cat allergy. (*Id.*). He then referred Plaintiff to the Asthma Center for further analysis and possible immunotherapy. (*Id.*). At the January 7 visit, Plaintiff described "chronic nasal congestion," shortness of breath, and wheezing, but she denied chest tightness, coughing, or cyanosis. (*Id.* at 664). Plaintiff's "sinus CT show[ed] bilateral sinus opacification," but

---

[11]    Sialadenitis is an infection of the salivary gland. *Sialadenitis*, Merck Manual Professional Version, https://www.merckmanuals.com/professional/ear,-nose,-and-throat-disorders/oral-and-pharyngeal-disorders/sialadenitis (last visited Apr. 14, 2016).

[12]    Paradoxical vocal fold motion ("PVFM") is a disorder in which the vocal cords "close when they should open, such as when breathing"; the condition can be mistaken for asthma, as it "leads to wheezing and difficulty breathing, sometimes to the point of requiring hospitalization." *Paradoxical Vocal Fold Movement (PVFM)*, American Speech-Language-Hearing Association, http://www.asha.org/public/speech/disorders/PVFM/ (last visited Apr. 15, 2016).

she did not have "symptoms of acute sinusitis." (*Id.* at 663). Plaintiff's lungs were "clear bilaterally to auscultation and percussion." (*Id.* at 666). Dr. Culmine prescribed a further course of Prednisone, to taper off gradually over approximately four weeks, along with Singulair, Advair, Claritin, Ventolin, Albuterol, Spiriva, and Flonase. (*Id.* at 666-67).

One month later, on February 8, 2013, Plaintiff was again hospitalized at Montefiore Hospital following two days of shortness of breath. (SSA Rec. 673). Plaintiff stated that she in fact felt short of breath every day and used her Albuterol inhaler approximately 20 times per day. (*Id.*). Plaintiff was "[f]ound to have severe asthma exacerbation likely [secondary] to bronchitis," and was administered intravenous steroids and azithromycin antibiotics. (*Id.* at 681). The treating notes indicate that Plaintiff's symptoms improved with an increased dose of steroids and frequent treatment by nebulizers. (*Id.*). Plaintiff was discharged on February 14, 2013, and counseled to follow up with an ENT regarding possible PVFM. (*Id.*). Plaintiff's discharge summary further referenced vitamin D deficiency and recommended vitamin D supplements on her medication list. (*Id.* at 681-82).

Plaintiff followed up with ENT Dr. Melin Tan-Geller on February 20, 2013, for an evaluation of her possible PVFM. (SSA Rec. 684). Dr. Tan-Geller noted Plaintiff's "episodic difficulty breathing" and her "tightness in [her] neck and chest," adding that Plaintiff sometimes felt like her "lungs and voice box close[d] off." (*Id.*). Dr. Tan-Geller stated, in her endoscopy note, "no pvfm seen on this exam but there is aberrant motion of vocal folds with quiet breathing

9

observed." (*Id.* at 687).  Nonetheless, Dr. Tan-Geller diagnosed laryngeal spasm and "possible pvfm," indicating that Plaintiff should be reevaluated in three months for potential treatment with Botox injections.  (*Id.* at 687-88).

### 2.    Plaintiff's Consultative Examination by Dr. Dipti Joshi

Two years prior to the ALJ hearing, on March 4, 2011, Dr. Dipti Joshi conducted a consultative internal medicine evaluation of Plaintiff.  (SSA Rec. 448).  In this evaluation, Dr. Joshi indicated that Plaintiff had a history of asthma and had been diagnosed with emphysema, and that her asthma was triggered by "walking one block and emotions." (*Id.*).[13]  Dr. Joshi further stated that Plaintiff "cooks four times a week, cleans every day, does laundry once a week, and shops once a week.  She does child care seven days a week.  She showers and dresses once a week.  She watches TV and listens to the radio." (*Id.*).

With regard to Plaintiff's symptoms, Dr. Joshi stated that Plaintiff "had wheezing bilaterally that was diffuse," but "was able to complete her sentences and [ ] did not have use of accessory muscles." (SSA Rec. 449).  Dr. Joshi added that Plaintiff's "[p]ercussion [was] normal," she did not have any "significant chest wall abnormality," and she had "[n]ormal diaphragmatic motion." (*Id.*).  Dr. Joshi diagnosed Plaintiff as having severe asthma and emphysema with a stable prognosis, and her medical source statement

---

13    The evaluation referenced Plaintiff's "six to seven ER visits," "three to four" hospitalizations, and two intubations in the previous year, and her frequent "severe coughing spells."  (SSA Rec. 448).

indicated that Plaintiff "should avoid dust, smoke, fumes, and strenuous exertion in light of her asthma and emphysema."  (*Id.* at 450).

### 3.   Plaintiff's Residual Functional Capacity Assessment

On March 28, 2011, M. Larson conducted a residual functional capacity assessment of Plaintiff.  (SSA Rec. 452).[14]  Larson indicated that Plaintiff had referenced at least seven emergency room visits, plus an inpatient admission in February 2010, but that the "[e]vidence received indicate[d] otherwise."  (*Id.* at 455).  Larson stated that "[a] second request to Montefiore and telephone contact to medical records indicated 2 ER and one inp[atient] admit only." (*Id.*).

Larson found Plaintiff had not established "exertional limitations," "postural limitations," "manipulative limitations," "visual limitations," or "communicative limitations."  (SSA Rec. 453-55).  Larson then noted that Plaintiff "state[d] she is able to cook, clean daily, do laundry, shop, cares daily for her young child.  Able to do own ADLS,[15] travel independently using public transportation, handle money, pay bills.  Evidence in file supports her diagnosis, however, it does not fully support her allegations of frequency or limitations.  [Claimant] would be capable of perform[ing past relevant work]." (*Id.* at 456).  Moreover, Larson stated that information from Plaintiff's treating sources did not significantly differ from the instant findings.  (*Id.*).

---

[14]    The record does not disclose Larson's first name or title.

[15]    The Court understands "ADLS" to refer to "activities of daily living."

**C.    The Hearing Before the ALJ**

At her benefits hearing on April 19, 2013, Plaintiff testified that she suffered from wheezing "all the time," and it worsen[ed] if she "walk[ed] too much," tried to clean, or was exposed to dust, heat, or cold.  (SSA Rec. 64).  At times, chemicals or things in the air, such as cigarette smoke, would make her cough excessively and suffer shortness of breath.  (*Id.*).  Beyond her issues with asthma, Plaintiff also described suffering from PVFM, which sometimes caused her to feel her throat was closing when she took deep breaths.  (*Id.* at 70-71).

Prior to the onset of her physical ailments, Plaintiff worked as a home attendant for the elderly and, before that, as a cashier and retail store worker. (SSA Rec. 52, 257).  In 2006, while pregnant, Plaintiff contracted pneumonia, after which she began developing "problems with [her] breathing."  (*Id.* at 53). Plaintiff stopped working at that time.  (*Id.*).

During her hearing, Plaintiff testified that, since developing these issues, she had to "take constant breaks from doing just anything, from walking," because she was "always out of breath."  (SSA Rec. 53).  As Plaintiff stated, "I can't walk quickly because then it feels like I'm running and then it feels like somebody is sitting on my chest."  (*Id.* at 66).  Plaintiff added that she has sleeping issues, waking up frequently because she is "out of breath constantly," and her medications also make her drowsy during the day.  (*Id.* at 67-68).  At the time of her hearing, Plaintiff indicated that she was taking numerous

medications, including Prednisone, Advair, Singulair, Spiriva, Claritin, Xolair, Symbicort, and Albuterol.  (*Id.* at 62-63).

Plaintiff testified that she lived with her sister, her sister's children, and her daughter.  (SSA Rec. 51, 55).  On a typical day, Plaintiff would dress her daughter and take her to school, go to medical appointments, and watch television or use the computer; she could travel by bus or subway if necessary. (*Id.* at 54-55).  Plaintiff testified that she could not help with cooking due to issues with the heat, and the chemicals involved in cleaning were "too much" for her.  (*Id.* at 55).  She noted that she could help her sister by washing dishes and by folding and carrying laundry, to an extent.  (*Id.* at 55, 70).  More specifically, Plaintiff stated that she could walk approximately one block before stopping, and she could lift 10 or 15 pounds.  (*Id.* at 56).  Plaintiff testified that she did not smoke cigarettes, but she might drink socially at a family gathering.  (*Id.*).  When asked why, in responses to a Social Security Administration questionnaire, she had claimed a greater capacity to help with cleaning and laundry, Plaintiff stated that she "didn't want to feel embarrassed that [she] couldn't do too much."  (*Id.* at 67).

At the conclusion of Plaintiff's benefits hearing, the ALJ consulted a vocational expert, Edna Clark, regarding Plaintiff's past work and her qualification to perform other work.  (SSA Rec. 78).  Clark summarized Plaintiff's work as a home attendant as "medium exertional" and "semi-skilled," her work in the retail store as "light" and "unskilled."  (*Id.*).  The ALJ asked Clark to assume a "hypothetical individual limited to the sedentary exertion

13

level" who must "avoid concentrated exposure to extreme heat and cold, wetness, humidity, fumes, odors, dust, gases, [and] poor ventilation." (*Id.* at 78-79).  Clark stated that such an individual could not perform Plaintiff's past occupations, but the individual could work as a "surveillance system monitor" or "new account clerk," both sedentary and unskilled jobs existing in the national and local economies.  (*Id.* at 79).

## D.     The ALJ's Opinion Denying Benefits

On May 9, 2013, the ALJ issued his decision on Plaintiff's application for Supplemental Security Income, adhering to the five-step determination process set forth in the Social Security Act, 20 C.F.R. 416.920(a).  (SSA Rec. 14-24). [16] At the first step, the ALJ indicated that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of January 19, 2011.  (*Id.* at 16).

---

[16]     The Second Circuit has described the five-step analysis as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If [she] is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider [her *per se*] disabled.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian* v. *Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (quoting *Talavera* v. *Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)).  "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step.  *Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

Next, the ALJ found that Plaintiff suffered from two severe impairments: asthma and COPD.  (SSA Rec. 16).  Although Plaintiff alleged a number of other disabilities — most notably, sialadenitis and PVFM — the ALJ found that these constituted only non-severe impairments; based on Plaintiff's CT scan from December 17, 2012, in combination with her lack of medical treatment for these issues, the ALJ determined that the record did not indicate that these "impose[d] anything further than minimal functional limitations."  (*Id.*). Similarly, although Plaintiff alleged a vitamin D deficiency, the ALJ found this was a non-severe impairment, as "the record [did] not contain documentation of complaints" of the relevant symptoms.  (*Id.* at 17).

At the third step, the ALJ found that Plaintiff did not have any impairment or combination of impairments meeting or medically equaling the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (SSA Rec. 17-18).  First, the ALJ determined that Plaintiff's treatment history for asthma did not satisfy the frequency requirements of listing 3.03(B) of Appendix 1 for asthma; as he explained, "while the claimant has admittedly received inpatient treatment for acute exacerbations, the frequency of this treatment does not rise to the level required by the listing."  (*Id.* at 17).  Under 3.03(B),[17] if Plaintiff had been treated for six exacerbations of sufficient severity

---

[17]    The listing at section 3.03(B) for asthma requires:

> Attacks (as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year.  Each in-patient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks.

(or the equivalent thereof) within one year, she would meet the requirements of the listing. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.03(B). However, as the ALJ detailed, Plaintiff was hospitalized in (i) February 2010, (ii) October 2010,[18] (iii) June 2011, (iv) January 2012, (v) August 2012, and (vi) February 2013. (*Id.* at 17). As such, Plaintiff's inpatient treatments did not, on their own, satisfy the criteria. (*Id.*). Moreover, because the ALJ found the record did not evidence acute exacerbations of sufficient severity between these dates, Plaintiff could not demonstrate that she satisfied the listing for asthma. (*Id.*).

The ALJ next addressed the listing at section 3.02 for chronic pulmonary insufficiency. (SSA Rec. 17).[19] While acknowledging that Plaintiff's FEV1 level satisfied listing criteria during a visit in August 2012, the ALJ explained that the listing required consideration of "the highest value of FEV1, whether from the same or different tracing … to assess the severity of the respiratory impairment." (*Id.* at 17-18). Because Plaintiff's FEV1 level measured at 1.96 liters on April 6, 2012, surpassing the listing criteria, the ALJ determined that Plaintiff did not ultimately satisfy the chronic pulmonary insufficiency listing at 3.02. (*Id.* at 17).

---

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.03(B).

[18]   As the ALJ also pointed out, "listing 3.03(B) states that the claimant's asthma exacerbations must occur 'in spite of prescribed treatment,'" whereas Plaintiff's records for this admission indicate that she had ceased using her prescribed Advair. (SSA Rec. 17). Thus, that particular hospitalization could not be considered "in spite of prescribed treatment." (*Id.*).

[19]   The listing at section 3.02 for chronic pulmonary insufficiency sets out minimum thresholds for forced vital capacity and one-second forced expiratory volume, determined in relationship to a patient's height. If a patient falls below the listed threshold, he or she is determined to have chronic pulmonary insufficiency. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.02.

At the fourth step, the ALJ found Plaintiff had the "residual functional capacity to perform sedentary work as defined in 20 C.F.R. 416.967(a) except [she] must avoid concentrated exposure to extreme heat and cold, wetness, humidity, fumes, odors, dusts, gases, and poor ventilation." (SSA Rec. 18).[20] The ALJ followed a two-step process to determine Plaintiff's ability to work: first, (i) he determined "whether there [was] an underlying medically determinable physical or mental impairment … that could reasonably be expected to produce the claimant's pain or other symptoms," and having done so, (ii) he "evaluate[d] the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit[ed] the claimant's functioning." (*Id*.). At the second step, the ALJ noted that if statements were not "substantiated by objective medical evidence," he would "make a finding on the credibility of the statements based on a consideration of the entire case record." (*Id*.).

The ALJ described Plaintiff's medical history — that she stopped working in 2006 due to breathing issues, required frequent breaks from physical activity, had been hospitalized and intubated, and regularly took prescription respiratory medications. (SSA Rec. 18). The ALJ also noted that, per Plaintiff's testimony, she "wheezes all the time," and dust, cold, and heat all exacerbate

---

[20]     "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

her breathing issues.  (*Id.*).  The ALJ then recited Plaintiff's hearing testimony regarding her daily activities:

> On a typical day, the claimant stated that [she] dresses her daughter and gets her dressed for school.  She testified that her sister does most of the household chores.  During the day, she stated that she goes to appointments or stays home.  She stated that she watches television during the day and goes on the computer.  She testified that her sister cooks, but she does prepare sandwiches.  She stated that she sometimes goes to family gatherings.  She stated she can walk a block without having to take a break.  She testified that she can lift/carry about 10-15 pounds.  She stated that she only helps with laundry.  She stated that she folds clothes and that she does not mop the floor.  She stated that she helps doing the dishes.  At the hearing, the claimant testified that she takes the bus and subway to travel.

(*Id.* at 18-19).  The ALJ also pointed out that Plaintiff "reported contradictory statements in her function report," but testified "that she was embarrassed to detail her actual limitations" in that earlier report.  (*Id.* at 19).

The ALJ then indicated that, although Plaintiff had received treatment, including inpatient treatment and physician intervention, for her asthma and COPD, she "maintain[ed] control of these conditions through a prescription regimen." (SSA Rec. 19).  With adherence to her prescriptions, her "treatment for exacerbations [was] generally infrequent," and she "at times went several months before receiving treatment for an alleged exacerbation."  (*Id.*).  Further, her emergency room visits were "generally infrequent."  (*Id.*).

Specifically, as the ALJ noted, Plaintiff had been most recently intubated in October 2010, following admission for "shortness of breath and coughing";

as the ALJ observed, however, while Plaintiff stated that her issues at that time were caused by exposure to rain, the treatment notes revealed that Plaintiff (i) had run out of Advair and (ii) had stopped using oral steroids four months prior to admission.  (SSA Rec. 19).  Her lung studies on that date "revealed no focal consolidation or effusion," and she was discharged approximately ten days later with a note that she "responded well to steroid treatment."  (*Id.*).

The ALJ next discussed Plaintiff's consultative internal examination by Dr. Dipti Joshi two years earlier, which examination the ALJ had described as "largely normal."  (SSA Rec. 19).  As the ALJ stated, while Plaintiff reported severe coughing spells, she also reported that she "cooks four times a week, cleans every day, does laundry once a week, and cares for her child upon a daily basis."  (*Id.*).  Moreover, while Plaintiff was wheezing at the examination, she "exhibited normal AP diameter," her "percussion was normal," and her "diaphragmatic motion was normal."  (*Id.*).  According to Dr. Joshi, Plaintiff needed to "avoid dust, smoke, fumes, and strenuous exertion," but her "prognosis was stable."  (*Id.*).

As the ALJ explained, following Plaintiff's September-October 2010 admission, there were no medical records of treatment until Plaintiff visited Dr. Culmine at Montefiore Hospital on June 6, 2011, complaining of coughing and wheezing.  (SSA Rec. 20).  At that time, she was treated with and responded well to an increased dose of Prednisone.  (*Id.*).  When Plaintiff followed up one month later, on July 6, 2011, she had run out of and stopped taking her Prednisone.  (*Id.*).

The ALJ then moved on to Plaintiff's next treatment with Dr. Culmine, on June 1, 2012.  (SSA Rec. 20).  At that time, although she complained of wheezing issues three to six days per week, her "lungs were clear to auscultation, with no signs of crackles, rhonchi, or wheezing upon examination," and she "denied dyspnea."  (*Id.*).  The ALJ noted that Dr. Culmine described Plaintiff's condition as "stable."  (*Id.*).

The ALJ continued, detailing Plaintiff's admission to Montefiore Hospital on August 18, 2012, "for an acute exacerbation after having an allergic reaction to a cat."  (SSA Rec. 20).  As the ALJ described, "[a]s on previous occasions, [Plaintiff] immediately responded to treatment, as she reported feeling better and exhibited good air exchange bilaterally with no signs of rales or rhonchi."  (*Id.*).  She was discharged as "stable" on August 24, 2012.  (*Id.*).

Then, the ALJ noted, Plaintiff "continued regular treatment without incident" until January 7, 2013, when she had a pulmonology visit with Dr. Max O'Donnell, complaining of "nasal congestion, sinus problems, shortness of breath, and wheezing."  (SSA Rec. 20-21).  The ALJ stated that Dr. O'Donnell did not identify signs of acute sinusitis, found Plaintiff's "lungs were clear bilaterally to auscultation and percussion," and reiterated that Plaintiff should "avoid allergens."  (*Id.* at 21).

Next, he related, Plaintiff received inpatient treatment on February 8, 2013, following "an asthma exacerbation second[ary] to bronchitis."  (SSA Rec. 21).  The ALJ indicated that Plaintiff "responded well to IV steroid treatment," and "[h]er symptoms improved dramatically after medication and

an increased dosage of steroids." (*Id.*).  As he stated, at a follow-up visit on
February 20, 2013, Plaintiff "presented in no acute distress." (*Id.* at 21).

After detailing Plaintiff's treatment history, the ALJ explained that while
he found Plaintiff's "medically determinable impairments could reasonably be
expected to cause some of the alleged symptoms," he nonetheless believed that
her "statements concerning the intensity, persistence and limiting effects of
these symptoms [were] not entirely credible." (SSA Rec. 21).  As he continued,
Plaintiff's asthma exacerbations were infrequent, with lengthy periods of time
between treatments, and she largely "maintain[ed] adequate control of her
symptoms through prescription medication." (*Id.*).  Moreover, he indicated,
some of Plaintiff's asthma exacerbations resulted from "non-compliance" with
her courses of treatment, including her October 2010 intubation, which
followed her failure to take prescribed Advair.  (*Id.*).  Additionally, the ALJ
stated, "treatment notes reveal that there were periods of time where the
claimant was not receiving steroid treatment and as such, experienced
exacerbations." (*Id.*).

Apart from non-compliance with prescribed medications, the ALJ found
that Plaintiff's "testimony at the hearing concerning her limited activities of
daily living [was] also not credible." (SSA Rec. 22).  The ALJ contrasted
Plaintiff's own function report and descriptions to Dr. Joshi — that she cooked
four times per week or daily, shopped for groceries twice a month, cleaned
every day, did laundry weekly, cared for her child on a daily basis, and traveled
by bus or subway — with her hearing testimony that she could not walk more

21

than one block or lift heavy objects without resting.  (*Id.*).  As the ALJ added, Plaintiff did not indicate, in her function report, that she had difficulties "lifting, standing, or climbing stairs."  (*Id.*).  Moreover, the ALJ found that Plaintiff's "allegations of fatigue, problems sleeping, and joint pain" were "inconsistent with the evidence of record," as she had previously denied fatigue, weakness, and joint pain during examinations on February 28, 2012, and January 7, 2013.  (*Id.*).  As the ALJ noted, "the record does not contain documentation of complaints of these symptoms."  (*Id.*).

Additionally, the ALJ stated that none of Plaintiff's treating sources had "issued a statement regarding [her] ability to engage in work activities," apart from one brief comment from Dr. Culmine, on June 1, 2012, that Plaintiff's "symptoms limit physical activity."  (SSA Rec. 22).  According to the ALJ, although Dr. Culmine was a treating physician, his comment was worth "only some weight because it [was] inconsistent" with Plaintiff's own statements in her function report.  (*Id.*).  Further, the ALJ pointed out that Dr. Culmine provided only this general statement, rather than a function-by-function assessment of Plaintiff's limitations, and thus, the notation was "entitled to less weight."  (*Id.*).  Even so, the ALJ found that Dr. Culmine's remark was consistent with the ALJ's own determination that Plaintiff was capable of sedentary work, and it comported with her treatment history for asthma issues.  (*Id.*).

In contrast, the ALJ accorded "significant weight" to the opinion of Plaintiff's consultative internist, Dr. Dipti Joshi, from March 4, 2011.  (SSA

Rec. 22).  According to the ALJ, Dr. Joshi determined that Plaintiff "should avoid dust, smoke, fumes, and strenuous exertion," which was consistent with Plaintiff's prior medical treatment, her stated activities of daily living, and Dr. Joshi's examination results.  (*Id.* at 22-23).  As the ALJ reiterated, "[t]he evidence of record does not indicate that any further limitations are warranted."  (*Id.* at 23).

Thus, the ALJ concluded that based on Plaintiff's "positive response to prescribed treatment," in conjunction with Dr. Joshi's report, "the absence of any detailed treating source opinion to the contrary," and Plaintiff's own statements regarding her daily activities, Plaintiff was capable of sedentary work.  (SSA Rec. 23).

Finally, the ALJ proceeded to list that Plaintiff (i) had no past relevant work, (ii) was a "younger individual" under 20 C.F.R. § 416.963, and (iii) had a "limited education" but could communicate in English.  (SSA Rec. 23).  Finding that Plaintiff did not have the ability to perform all or substantially all of the requirements of sedentary work, the ALJ consulted a vocational expert at Plaintiff's hearing to determine whether suitable jobs existed for someone with Plaintiff's limitations — someone who must "avoid concentrated exposure to extreme heat and cold, wetness, humidity, fumes, odors, dust, gases, [and] poor ventilation."  (*Id.* at 23-24).  The ALJ stated that, per the vocational expert's testimony, someone with Plaintiff's limitations would be able to work as a surveillance systems monitor or a new account clerk.  (*Id.*).  Taking all this into account, the ALJ found there were jobs that exist in significant numbers in

23

the national economy that Plaintiff could perform under 20 C.F.R. § 416.969. (*Id.* at 23).   Accordingly, Plaintiff would be "capable of making a successful adjustment to other work that exists in significant numbers in the national economy," and therefore, she was not disabled.   (*Id.*).

## E.   Procedural History

Rodriguez requested a review by the Appeals Council of the ALJ's decision denying her benefits, which request was denied on December 8, 2014. (SSA Rec. 1-7).   Rodriguez then filed her Complaint, appealing the Commissioner's denial of her benefits application, on January 15, 2015.   (Dkt. #2).   The Commissioner filed her instant motion for judgment on the pleadings on August 5, 2015.   (Dkt. #11).   Rodriguez filed her cross-motion for judgment on the pleadings on October 9, 2015 (Dkt. #16), to which the Commissioner filed her opposition on November 4, 2015 (Dkt. #20).   No further submissions have been filed, and the Court therefore considers the Commissioner's November 4 memorandum as concluding the briefing.

## DISCUSSION

## A.   Applicable Law

### 1.   Motions Under Federal Rule of Civil Procedure 12(c)

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).   A court applies the same standard applied to a motion for judgment on the pleadings as that used for a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).   *Sheppard* v. *Beerman,*

18 F.3d 147, 150 (2d Cir. 1994); *accord L-7 Designs, Inc.* v. *Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011).  When considering either, a court should "draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)).  A plaintiff is entitled to relief if she alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("[W]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [Plaintiff's] claims across the line from conceivable to plausible.") (internal quotation marks omitted)).

### 2.    Review of Determinations by the Commissioner of Social Security

In order to qualify for disability benefits under the Act, a claimant must demonstrate her "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).  The claimant must also establish that the impairment is "of such severity that [the claimant] is not only unable to do [her] previous work but cannot, considering [her] age,

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Furthermore, the disability must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3).

The presiding ALJ has an affirmative obligation to develop the administrative record. *See Lamay* v. *Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009); *Casino-Ortiz* v. *Astrue*, No. 06 Civ. 155 (DAB) (JCF), 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007) (citing *Perez* v. *Chater*, 77 F.3d 41, 47 (2d Cir. 1996)). This means that the ALJ shall "make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make" a determination as to the claimant's disability. 42 U.S.C. § 423(d)(5)(B).

In reviewing the final decision of the Social Security Administration (the "SSA"), a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A court must uphold a final SSA determination to deny benefits unless that decision is unsupported by substantial evidence or is based on an incorrect legal standard. *Selian* v. *Astrue,* 708 F.3d 409, 417 (2d Cir. 2013) ("In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." (quoting

*Talavera* v. *Astrue*, 697 F.3d 145, 145 (2d Cir. 2012))); *see also* 42 U.S.C.
§ 405(g) ("If there is substantial evidence to support the determination, it must
be upheld.").  Where the findings of the SSA are supported by substantial
evidence, those findings are "conclusive." *Diaz* v. *Shalala*, 59 F.3d 307, 312 (2d
Cir. 1995) ("The findings of the Secretary are conclusive unless they are not
supported by substantial evidence." (citing 42 U.S.C. § 405(g))).

"Substantial evidence" is "more than a mere scintilla.  It means such
relevant evidence as a reasonable mind might accept as adequate to support a
conclusion." *Talavera*, 697 F.3d at 151 (quoting *Richardson* v. *Perales*, 402
U.S. 389, 401 (1971)).  The substantial evidence standard is "a very deferential
standard of review — even more so than the clearly erroneous standard."
*Brault* v. *Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (citation
omitted).  To make the determination of whether the agency's findings were
supported by substantial evidence, "the reviewing court is required to examine
the entire record, including contradictory evidence and evidence from which
conflicting inferences can be drawn." *Talavera*, 697 F.3d at 151 (quoting
*Mongeur* v. *Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).

**B.    Analysis**

In her cross-motion for judgment on the pleadings, Plaintiff contends
that the ALJ's decision was not based on a full and fair evaluation of the
record, was not supported by substantial evidence, and was marked by
material error.  (Pl. Br. 4).  Specifically, Plaintiff argues that the ALJ (i) failed to
explain how Plaintiff remained capable of performing sedentary work; (ii) failed

to "obtain updated and detailed medical source statements" from treating physicians to fill in gaps in the record; (iii) failed to "provide the required detailed credibility analysis" with regard to Plaintiff's symptoms; and (iv) failed to provide adequate reasoning for the weight assigned to each medical report. (*Id.* at 5-9). Defendant counters that (i) the ALJ fully developed the record; (ii) he properly conducted the credibility analysis regarding Plaintiff's subjective claims; and (iii) his opinion was supported by substantial evidence. (Def. Br. 14-21; Def. Opp. 1-5).

### 1.    The ALJ Did Not Satisfy His Duty to Develop the Record and Erred in Applying the Treating Physician Rule

As the Second Circuit has explained, before assessing an ALJ's opinion for support by substantial evidence in the record, a court should

> satisfy [itself] that the claimant has had "a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." The need for this inquiry arises from the essentially non-adversarial nature of a benefits proceeding: the [Commissioner] is not represented, and the ALJ, unlike a judge in a trial, must himself affirmatively develop the record.

*Echevarria* v. *Sec'y of Health & Human Servs.,* 685 F.2d 751, 755 (2d Cir. 1982) (quoting *Gold* v. *Sec'y of HEW,* 463 F.2d 38, 43 (2d Cir. 1972)) (internal citations omitted). As part of this, the ALJ has a duty to resolve apparent ambiguities relevant to his disability determination, *see Corporan* v. *Comm'r of Soc. Sec.*, No. 12 Civ. 6704 (JPO), 2015 WL 321832, at *30 (S.D.N.Y. Jan. 23, 2015), and to seek information to fill in significant temporal gaps, *see Calzada* v. *Astrue,* 753 F. Supp. 2d 250, 273-74 (S.D.N.Y. 2010) (finding that the ALJ

28

failed to adequately develop the record where a two-year gap in the record existed and evidence suggested the claimant's condition likely changed during that period).

Further, under the SSA regulations, medical opinions of a claimant's treating physician warrant special deference. 20 C.F.R. § 404.1527(c)(2). Thus, where a claimant's treating physician offers an opinion on the "nature and severity" of her impairments, the physician's opinion is entitled to "controlling weight," so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and consistent with "the other substantial evidence in [the] case record." *Id.* The treating physician rule recognizes that a claimant's treating doctor may be best suited to "provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)," and may even be able to provide "a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Id.*

Here, while the ALJ described Plaintiff's treatment history in great detail, the Court cannot conclude that he adequately developed the record, given his duty to make "every reasonable effort to obtain from [Plaintiff's] treating physician (or other treating health care provider) all medical evidence" necessary to make a proper determination as to Plaintiff's potential disability. 42 U.S.C. § 423(d)(5)(B). The Court further determines that, if the comments from Dr. Culmine were considered to be the opinion of a treating physician

29

under the statute, the ALJ did not adequately adhere to the treating physician rule.  Accordingly, the Court finds the ALJ based his decision on an incorrect legal standard.

Plaintiff's collected medical records span from May 2009 — over 18 months before her alleged onset date — to February 2013, only two months before her benefits hearing.  (SSA Rec. 479-80, 673).  However, as Defendant acknowledges, "there is no clear notation in the existing record that the agency and the ALJ sought what the Commissioner's regulations state will be sought as a matter of course, namely, a medical source statement."  (Def. Opp. 3).  The ALJ opinion similarly states that "no treating source [ ] issued a statement regarding the claimant's ability to engage in work activities aside from a brief statement by Dr. John Culmine on June 1, 2012 that the claimant's 'symptoms limit physical activity.'"  (SSA Rec. 22).

Defendant points out that failure to request medical source statements is not reversible error where "the record contains sufficient evidence from which an ALJ can assess [Plaintiff's] residual functional capacity."  (Def. Opp. 3 (citing, *inter alia*, *Tankisi* v. *Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (summary order)).  The Court does not dispute this, and understands that courts within this District have found that "it is not per se error for an ALJ to make a disability determination without having sought the opinion of the claimant's treating physician."  *Sanchez* v. *Colvin*, No. 13 Civ. 6303 (PAE), 2015 WL 6619367, at *10-11 (S.D.N.Y. Oct. 30, 2015).  Still more, the Court acknowledges that ALJs may *decline* to give controlling weight to the opinions

of treating physicians where they are unsupported by objective medical evidence or contradict substantial evidence in the record. *See, e.g., Halloran* v. *Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Lewis* v. *Colvin*, 548 F. App'x 675, 678 (2d Cir. 2013) (summary order).

Here, the ALJ acknowledged Dr. Culmine's comment but accorded it "only some weight," finding it to be inconsistent with Plaintiff's own statements in her function report, and concluding that it amounted to only a "general statement," rather than "a function-by-function assessment of the claimant's limitations." (SSA Rec. 22). Still, the ALJ indicated that he could nonetheless reconcile this comment with his ultimate finding — that Plaintiff remained capable of sedentary work — and with Plaintiff's treatment history for asthma exacerbations. (*Id.*).

However, the Court cannot accept the notion that Dr. Culmine's statement is entitled to lesser weight because of the doctor's failure to provide a function-by-function analysis, given the ALJ's duty to request a treating physician's medical opinion where needed, and the Court is not swayed that the objective medical evidence in the record clearly refutes Dr. Culmine's assessment. Rather, the Court believes Plaintiff's lengthy treating history with Dr. Culmine, comprising both frequent visits and extensive courses of prescription medication, required the ALJ to seek a more complete picture from the doctor of Plaintiff's potential limitations.

Where an ALJ discounts the conclusions of a treating physician, the ALJ should consider a number of factors, including (i) the "[l]ength of treatment

31

relationship and the frequency of examination," (ii) "the [n]ature and extent of the treatment relationship," (iii) the amount of relevant evidence supporting the opinion, "particularly medical signs and laboratory findings," (iv) the opinion's consistency with the record, (v) whether the opinion comes from a specialist, and (vi) any other factors brought to the ALJ's opinion.  20 C.F.R. § 404.1527(c); *see also Shaw* v. *Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (internal quotation omitted).  Moreover, the ALJ must "set forth [his] reasons for the weight [he] assigns to the treating physician's opinion.  20 C.F.R. § 404.1527(c); *see also Clark* v. *Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (internal citation omitted).

Whether the treating physician conducted a function-by-function analysis is not a factor under 20 C.F.R. § 404.1527(c), but, rather, suggests that Dr. Culmine provided insufficient information upon which the ALJ could make a disability determination.  Moreover, if the ALJ did consider this comment to be a treating source opinion which he discounted, he failed to address several of the listed factors.  Although he stated that Dr. Culmine's opinion was "unclear and vague" and contradicted Plaintiff's function report, he did not clearly consider Plaintiff's lengthy treating relationship with and frequent visits to Dr. Culmine.  (SSA Rec. 22).

Further, in considering the medical evidence, the ALJ stated that Plaintiff's exacerbations were resolved with or responded well to steroid treatment on multiple occasions (SSA Rec. 20-21), and noted that "*some* of her asthma exacerbations stem[med] from non-compliance" with medication (*id.* at

21 (emphasis added)).  However, the Court does not find that this amounts to sufficient medical evidence warranting the decision not to seek additional information from Dr. Culmine.  While the Court agrees that there were often lengthy gaps between Plaintiff's inpatient treatment for asthma exacerbations (*see id.* at 20), this does not clearly equate to Plaintiff's ability to perform sedentary work on a day-to-day basis.  Given that Plaintiff visited Dr. Culmine at least seven times between her alleged onset date and her hearing, the ALJ had a duty to seek an assessment from him in order to determine whether Plaintiff retained the residual functional capacity to perform sedentary work.

While it is possible the ALJ sought a statement to no avail, neither his opinion nor the record clearly reflects this, and as noted, Defendant states that "there is no clear notation in the existing record that the agency and the ALJ sought what the Commissioner's regulations state will be sought as a matter of course, namely, a medical source statement." (Def. Br. 3).  In contrast, the ALJ accorded more weight to Dr. Joshi's consultative examination, as it was the only report in the record clearly assessing Plaintiff's capabilities on a function-by-function basis.  (SSA Rec. 22).  Further, the ALJ stated that Dr. Joshi's conclusions were consistent with Plaintiff's initial function report and with Dr. Joshi's own examination results.  (*Id.*).  The Court notes, however, that Plaintiff's function report was contemporaneous with Dr. Joshi's report, both of which occurred a full two years prior to Plaintiff's hearing before the ALJ.  (*Id.*). And, as emphasized above, between the consultative examination and her hearing, Plaintiff was admitted for inpatient treatment on two occasions and

visited Dr. Culmine at least seven times for treatment.  *See supra* at 2-7.

Although the dates of her inpatient admissions did not meet the required

frequency of the disability listing for asthma, the Court finds that Plaintiff's

numerous medical visits and hospitalizations warrant a more recent treating

source statement.[21]

Separately, Plaintiff's medical visits immediately prior to her hearing

diagnosed possible paradoxical vocal fold motion.  (SSA Rec. 684, 696-99).  At

the hearing, Plaintiff described this condition, stating "my airway, it's supposed

to open when you breathe and instead of opening it closes so it makes it harder

for me to breathe."  (*Id.* at 60).  While the ALJ concluded that Plaintiff's possible

PVFM was "non-severe" based on her CT scan and "little treatment" for the

condition (*id.* at 16), the medical records indicate that Dr. Tan-Geller instructed

Plaintiff to follow up in three months for reevaluation and possible treatment

by Botox injections (*id.* at 687).  Given that Dr. Tan-Geller's evaluation

occurred less than three months before Plaintiff's disability benefits hearing,

---

[21]     In her brief, Plaintiff argues that she might, in fact, satisfy the frequency of
exacerbations required to meet the listing for respiratory disorders under the
regulations; because she has two documented inpatient treatments, she "required
evidence of only two additional asthma attacks despite treatment during the 12 months
period, to establish listings level impairment."  (Pl. Br. 7-8).  Plaintiff references
"worsening of [her] chronic rather than acute" symptoms and "intensive medical
treatment" in January, February, April, and June 2012, and in August 2012 and
February 2013.  (*Id.* at 8).  She then states that the ALJ had an "obligation to conduct a
further inquiry," which might have revealed that she had experienced the "required
additional two severe asthma attacks to show a combination of impairment of listings
severity ... or prevent the performance of full time competitive work at even the
sedentary level."  (*Id.* at 8-9).  Given that the Court remands for failure to seek a
treating source statement, the Court need not address the prospect that Plaintiff's
medical issues may have, in fact, amounted to a listings-level disability.

the Court cannot be certain, absent a further statement from one of Plaintiff's ENTs, that this condition did not amount to a severe disability.

Because the Court remands on the ground that the ALJ failed to develop the record fully by seeking further information from Plaintiff's treating physician, the Court need not consider the adequacy of the ALJ's credibility determinations regarding Plaintiff's own testimony at her benefits hearing.

## CONCLUSION

For the foregoing reasons, Rodriguez's motion for judgment on the pleadings is GRANTED insofar as it requests remand for rehearing; and the Commissioner's motion for judgment on the pleadings is DENIED.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:     April 18, 2016
           New York, New York

_____
    KATHERINE POLK FAILLA
   United States District Judge